ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY OF TEXAS v. L. J. MAUNEY.

No. 6514.   Decided April 29, 1936.
(93 S. W., 2d Series, 377.)

*Crosby, Estes & Estes,* of Greenville, for plaintiff in error.

Plaintiff has not discharged the burden of showing that he was actually prejudiced by the alleged misconduct.   Carver v. Moore, 275 S. W., 90; Isbell v. Lennox, 116 Texas, 522, 295 S. W., 920; Foster v. Bunting, 19 S. W. (2d) 784.

*J. H. Beavers,* of Longview, *R. T. Wilkinson, Jr.,* of Mt. Vernon, for defendant in error.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

This is a railroad crossing case in which the trial court rendered judgment for plaintiff in error, St. Louis, Southwestern Railway Company of Texas, on jury findings upon special issues which include findings of contributory negligence on the part of plaintiff, L. J. Mauney, defendant in error here, proximately causing his injuries. The Court of Civil Appeals filed no opinion in the case but filed a "Memorandum of Reasons of the Court for Reversing and Remanding the Cause," which has not been published. The reason assigned in the memorandum for the court's action in reversing and remanding the case is that the trial court erred in not granting plaintiff's motion for a new trial. It was the court's view that the motion should have been granted on account of misconduct of the jury in its deliberations with respect to the issues of contributory negligence touching Mauney's failure to discover, look or listen for the approach of the train before undertaking to cross the track.

We are in accord with the views set forth in the memorandum.

Mauney and the driver of the truck in which he was riding were proceeding along a highway running parallel with the track. At the point where they made a right-angle turn into another road which crossed the track there was a dump along the side of the road into which they had turned, which obstructed a view of the track in the direction from which the train was coming. Plaintiff's testimony in this connection and in describing the approach of the truck to the crossing, reads in part:

"When we struck the road running north and south across the railroad track we turned north. Right due south from the south rail of the railroad track to the place where the truck was when we turned is I guess about 75 or 80 feet * * *. From there to the railroad there is an embankment about 10 or 12 feet high. Going north after you get into that road the highest embankment is on the right side. After you get into that road going to the railroad crossing there is a decline down to the railroad track. The decline was not so heavy but it was enough that you would have to throw on the brakes pretty well. In going north to the railroad track the north edge of that embankment was somewhere about 20 feet from the south

rail of the railroad track * * *. When we started down that decline the truck was going about 4 miles an hour I guess, something like that * * *. Shoemaker (the driver) said, 'I will look this way and you look back that way as I cannot turn around in the truck and look back west. Yes, after we started down to the crossing and when we got out from the embankment I looked for the train then. No sir, I didn't see any train at all."

The height of the dump decreased in the direction of the track. One of the strongly contested points was the distance from the track at which the dump had decreased in height sufficiently for plaintiff to have an unobstructed view of the track in the direction from which the train approached and how far along the track the view was unobstructed. The evidence upon this point was conflicting.

The following excerpt from the court's memorandum above referred to reflects in part the misconduct complained of:

"It appears that while discussing these issues of contributory negligence one of the jurors, who had been selected as foreman, arose and drew on the wall a diagram of the railway track and the road at the point of crossing and stated that he knew about and of the crossing because he had passed over it many times during the past four years. Two other jurors stated that they also had personal knowledge and observation of the crossing at which the collision occurred. Without stating the evidence in detail, it fairly appears from the record that in making the diagram of the crossing and statements in respect thereto of what they knew of the crossing they were giving personal experiences and observations. It was stated by one of the jurors: 'Yes, sir, I was acquainted with the embankment and all of the surroundings around there. Sure, when I gave that opinion it was from what I knew of the crossing and from the testimony.' The opinion referred to was that 'I said, "Men, I believe when Mauney came from behind that embankment and traveled 34 or 39 feet, when there, I believe that if he had looked east he could have seen that train." ' The three men who made remarks about personal knowledge of the crossing were men of the jury. One of the jurors testified that if the evidence and the statement of the juror 'were both the same I would have to rely on them both.' Although the opinion stated by the jurors may be regarded very nearly in line with the general evidence in the case, yet the opinion or observation by these three jurymen were probably understood by the other jurors as being purely their private opinion arising from a per-

sonal knowledge of the crossing. It may not be said that it is not doubtful that the acts and remarks did not influence the jury in the answer to the finding."

It appears from other testimony given on the hearing on the motion for new trial how largely the personal knowledge and experience of some of the jurors entered into the deliberations. The foreman, Mr. Middleton, testified he drew on the east wall of the jury room a little plot of how the railroad ran and also the road plaintiff and the driver were traveling and where the crossing was; that from what he knew of the crossing he did not think it necessitated or required his consideration of any of the evidence to draw the plot. Another of the jurors, Mr. White, testified there were three members of the jury including Mr. Middleton who told the other members they were acquainted with the crossing; that Mr. Middleton said he knew all about it and had carried the mail over it; that he just knew it so well he didn't have to pay any attention to the testimony. He further testified that before the jury had answered the special issue inquiring whether Mauney could have seen the train after the truck had proceeded a certain distance along the embankment Mr. Middleton stated if Mauney had looked to the right after he came out from the embankment he could have seen the train in time to have stopped. Mr. White further testified that:

"When they came to that question I got up and walked out in front of them and I said, 'Men, I believe when Mauney came from behind that embankment and traveled that thirty-four or thirty-nine feet there I believe that if he had looked east he could have seen the train * * *. Sure, when I gave that opinion it was from what I knew of the crossing and from the testimony; I was like Mr. Middleton was, the testimony was so close to what I knew about it I could not make any distinction, * * * I don't remember but three of us saying that we were acquainted with the crossing.' "

Juror Enke testified that Mr. Middleton and Mr. Weatherford both said they knew the crossing from personal knowledge, and that Mr. Middleton said that on account of his knowledge of it he did not have to listen to the testimony describing it. He further testified that after Mr. Middleton told him and the other jurors about his acquaintance with the crossing and had described it he thought "his statement could have a bearing over us * * *;" and further said Mr. Middleton had told it like he had it in mind, adding: "If he had told it different it might have had some influence on me."

The testimony with respect to the point from which the occupants of the truck could see the train over the embankment was conflicting. Plaintiff placed it at about 20 feet. Shoemaker, the driver of the truck, placed it at about 39 feet. Other witnesses fixed the point at a still greater distance. In fact the testimony upon all issues submitted to the jury, including the issue requiring whether plaintiff failed to look for the train, was conflicting.

We think it a very conservative statement which goes no further than to say it is reasonably doubtful whether the statements above referred to influenced the jury in reaching its verdict. Defendant was not entitled to an instructed verdict, and in view of its being reasonably doubtful as to whether the statements may have had an effect unfavorable to plaintiff, the trial court should have granted the motion for new trial. Casstevens v. Texas & P. Ry. Co., 119 Texas, 463, 32 S. W. (2d) 637.

The judgment of the Court of Civil Appeals reversing and remanding the case is affirmed.

Opinion adopted by the Supreme Court April 29, 1936.